UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHERYL GRONEFELD,                    )
                                     )
            Plaintiff,               )
                                     )
        v.                           )    No. 4:06 CV 386 DDN
                                     )
CITY OF NORMANDY,                    )
GORDON CHAMBERS,                     )
and JOHN CONNOLLY,                   )
                                     )
            Defendants.              )

**MEMORANDUM**

This matter is before the court on the motion of defendants City of Normandy, Gordon Chambers, and John Connolly for summary judgment. (Doc. 13.) The parties have consented to the authority of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). A hearing was held on April 10, 2007.

**I. Pleadings**

Plaintiff Cheryl Gronefeld brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, et seq., against defendants City of Normandy, Gordon Chambers, and John Connolly, alleging that she was discriminated against in her employment because of her gender. Gronefeld alleges that she was employed as a patrol officer for the City of Normandy from February 9, 2002, until October 8, 2004, when her employment was terminated. Chambers was a sergeant with the police force and her supervisor for a period of time. Connolly was the Chief of Police for the City of Normandy. Plaintiff alleges that Connolly, her shift supervisor, engaged in discriminatory conduct towards her. She alleges she was retaliated against for filing a complaint against Chambers. Plaintiff alleges four claims for relief:

1.  Count I alleges the City of Normandy violated Title VII by providing      a hostile work environment, disparate treatment, and retaliation;

2.  Count II alleges the City of Normandy violated the Missouri Human Rights Act by subjecting her to a hostile work environment, disparate treatment, and retaliation;

3.     Count III alleges Chambers, as an individual, violated the Missouri
       Human Rights Act by subjecting her to a hostile work environment,
       disparate treatment, and retaliation; and

4.     Count IV alleges Connolly, as an individual, violated the Missouri
       Human Rights Act by subjecting her to a hostile work environment,
       disparate treatment, and retaliation.

(Doc. 1.)

Defendants moved for summary judgment.  They argue that there is
no evidence Chambers's actions were based on plaintiff being a female
and that their actions were not so severe as to alter the conditions of
her employment or create an abusive working environment.  They also
argue that Chambers never initiated any adverse employment action
towards plaintiff and that she was not retaliated against.  They argue
she was terminated from her job because she was chronically late for
work without an excuse.

Plaintiff argues that there are substantial questions of material
fact and summary judgment should be denied.

## II.   Summary Judgment Standard

Summary judgment must be granted when the pleadings and proffer of
evidence demonstrate that no genuine issue of material fact exists and
the moving party is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Union
Elec. Co. v. Southwestern Bell Tel. L.P., 378 F.3d 781, 785 (8th Cir.
2004).  The court must view the evidence in the light most favorable to
the nonmoving party, in this case plaintiff Gronefeld, and accord her
the benefit of all reasonable inferences.  Union Elec. Co., 378 F.3d at
785.  A fact is "material" if it might affect the outcome of the case,
and a factual dispute is "genuine" if substantial evidence exists so
that a reasonable jury could return a verdict in favor of the non-moving
party.  Die-Cutting Diversified, Inc. v. United National Ins. Co., 353
F. Supp. 2d 1053, 1055 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an
issue for trial.  Celotex, 477 U.S. at 323.  Once a motion is properly
made and supported, the nonmoving party may not rest upon the

allegations in her pleadings but must instead proffer admissible evidence of specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 800 (8th Cir.), <u>cert. denied</u>, 543 U.S. 956 (2004); <u>Krein v. DBA Corp.</u>, 327 F.3d 723, 726 (8th Cir. 2003).

### III.  Undisputed Facts

A complete review of the record reveals the following undisputed facts, viewed in the light most favorable to plaintiff.

Plaintiff Cheryl Gronefeld was employed as a police officer for the City of Normandy from February 2, 2002, until October 8, 2004.  She worked twelve-hour shifts, either from 6:00 a.m. to 6:00 p.m., or vice versa.  One sergeant and three officers were assigned to each shift. Defendant Chambers is a Sergeant for the Normandy Police Department. On June 9, 2003, due to a department wide reorganization, plaintiff was assigned to Chambers's shift.  She worked on that shift until October 26, 2003, a little over four months.  (Doc. 13, Attach. 3 at 1; Gronefeld Dep. 24-29.)

On April 7, 2003, while under Sergeant House, plaintiff was late for her 6:00 a.m. shift.  Several attempts were made to call both her house phone and cell phone, but she could not be reached. She called Lieutenant Cummings Cantwell at 8:50 a.m. to say she was on her way, and said that she was late because the electricity had gone out in her home and she had overslept.  (Doc. 13, Defendants' Statement of Facts in Support of Motion for Summary Judgment ("SOF") at ¶ 61-62; NOR 0052-53.[1])

On April 25, 2003, plaintiff failed to show up for a training class at the St. Louis Police Academy.  She e-mailed Sergeant Jeffrey Ballard that she "done went and forgot."  (Doc. 13 Ex. E; NOR 0054-55.)

On June 9, 2003, plaintiff was transferred to Chambers's shift. After approximately four weeks on his shift, plaintiff felt he began to

---

[1]References to NOR are to plaintiff's personnel file, Doc. 13, Attach. 16-22.

treat her differently.[2]   Plaintiff felt Chambers made derogatory statements about women, such as that women belonged in the kitchen or on a stripper pole.  She said he made such comments approximately 50 times during the time she was assigned to his shift.  (Gronefeld Dep. at 31-32.)

On September 11, 2003, plaintiff was late for work.  She called Officer Scott Stuber to say she would be late, and they got in an argument about her tardiness and it causing the other officers to have to cover her shift.  Stuber e-mailed Cantwell, Chambers, and Connolly about the phone call and argument.  (NOR 0060-62.)

Around early October 2003, plaintiff went to Lieutenant Cantwell to ask for a shift change, and he advised her to try to work out her differences with Chambers.  Two to three weeks later, she renewed her request for a shift change.  Cantwell met with Connolly to discuss the shift change.  Her request for transfer was granted.  She did not tell Connolly that Chambers's comments towards women were the reason for her desire to change shifts.  She was told her shift switch would have to wait one week due to the problem of having the switching officers working 24 hours with no sleep.  Chambers told plaintiff to take the rest of her days on his shift as vacation days.[3]  (Doc. 13, SOF at 3-4.)

After plaintiff's shift change was granted, but before she actually changed shifts, plaintiff had an encounter with Chambers during a

_____

[2]Plaintiff alleges Chambers yelled at her in front of co-workers for minor infractions that went un-reprimanded when male co-workers violated them, and that male co-workers were often disciplined in private.   Other male co-workers, including Scott Stuber and Steve Whitworth, complained that they were reprimanded in public.

Plaintiff alleges that she was required to eat her lunch at the station three times, while men were allowed to go out, that she was reprimanded for minor infractions, like her mailbox being too full and her reports not being done properly.  She felt Chambers spoke down to her and would not listen to her complaints about him.  Other, male officers stated in affidavits that they were sometimes required to stay in for lunch.  (Doc. 19 at 3; Gronefeld Dep. at 31-32; Stuber Aff. at 1.)

[3]Gronefeld felt this statement by Chambers, that she take her remaining days on his shift as vacation days, was a threat.  (Doc. 19 at 2.)

traffic stop.  Chambers walked up to plaintiff while she was engaged in a traffic stop of two persons for whom there were active warrants. While Officer Stuber had one suspect secured, Chambers unbuttoned and unzipped her shirt, put his hand in her shirt, took her name tag off, and handed it to her, directing her to fix it later.  One of the two clasps securing it came undone and it was hanging askew.  Prior to the shift switch, Connolly learned of the shirt incident.  His interview with Gronefeld revealed she felt Chambers's behavior was demeaning and inappropriate, but she did not mention that she believed it was sexual. She did not want to make a formal complaint initially, but ultimately did so.  Connolly reprimanded Chambers.  (Doc. 13, SOF at 4-5; Gronefeld Dep. at 54-60; Connolly Aff. at 2-4.)

Plaintiff was transferred to another shift on October 26, 2003. On October 29, 2003, Chambers issued his evaluation of plaintiff.  He scored her at 79.89 percent, which plaintiff indicated on the evaluation she believed was unfair due to her conflict with Chambers.  (NOR 0056-59.)

After Gronefeld was transferred, she felt she was picked on for minor issues.  Plaintiff said backup assistance did not arrive for her when she requested it.[4]  (Doc. 13, SOF at 2-7.)

Plaintiff was late to work on December 18, 2003.  Ballard attempted to call her twice, but she did not arrive until 6:50 a.m.  Plaintiff reported that her daughter was sick the night before and that caused her to oversleep.  On January 5, 2004, Connolly suspended plaintiff for 12 working hours because of her tardiness on December 18, 2003, September 11, 2003, and April 7, 2003, and for missing service training on April 25, 2003.  (Doc. 13, SOF at 9; Ballard Aff. at 2; NOR 0063-64.)

On January 28, 2004, Ballard wrote a memorandum to plaintiff concerning her report writing, which he felt was incomplete.  (Ballard Dep. at 2; Ex. S.)

---

[4]Her new supervisor, Sergeant Ballard, and Officer Louis Porzelt stated in affidavits that they would sometimes announce on the radio that they were "present" as her backup, when actually they were still on their way to the scene.  They stated this was common practice. (Porzelt Aff. at 2; Ballard Aff. at 5.)

On April 12, 2004, Ballard submitted an evaluation of plaintiff, giving her an 81.51 percent. He opined that "Officer Gronefeld has the ability to be a good officer. I believe she can do a good job. When she takes her time, she produces good quality work." (NOR 0067-70.)

On May 1, 2004, plaintiff arrived at work wearing the winter uniform, which included a long sleeve shirt and mock turtleneck. Chambers asked plaintiff to return home and change, which she did. Gronefeld complained to Cantwell, and he upheld Chambers's decision to send her home to change because she was, in fact, wearing the wrong uniform. (NOR 0073-74.)

On May 16, 2004, plaintiff did not arrive for her 6:00 a.m. shift until 6:43. She reported her alarm did not go off. She was suspended for 60 hours without pay and placed on probation for six months. Connolly dispensed this discipline. (Doc. 13, SOF at 9; NOR 0079.)

On May 20, 2004, Connolly met with Gronefeld about certain issues he had heard about. An unknown individual reported to Connolly that plaintiff would often stay out late and party. This person also reported that plaintiff would leave her young daughter home alone while she partied. Connolly talked to plaintiff about her lifestyle and whether it was contributing to her arriving late for work.[5] For her tardiness on May 16, 2004, plaintiff was placed on a five-day suspension, and six months probation, effective immediately. Her suspension days were to be June 11, 12, 13, 21, and 22. She was warned in writing that her employment was in "serious jeopardy." (Doc. 13 at 10; NOR 0079.)

On May 27, 2004, during her probation, plaintiff was two hours late and reported that she had a flat tire and there was an accident on the highway. She was not disciplined for this tardiness. (Doc. 19 at 2; Connolly Aff. at 10.)

Gronefeld requested vacation days on July 5 and 6, 2004 to go on a vacation, but her request was denied because another officer had already requested those days. Gronefeld asked the other officer if he would switch days with her. He said no. Before the July Fourth

[5]Plaintiff felt these inquiries were inappropriate pries into her personal life and were based on rumors. (Doc. 19 at 4.)

weekend, she complained of feeling sick at work. On July 2, 2004, plaintiff called in sick, saying she would not be at work until after July 5 and 6, 2004. She also stated that she had disconnected her home phone and would only be available at her cell phone number. (Doc. 13, SOF at 10; NOR 0081.)

On August 2, 2004, Officer McCarthy advised Connolly that he had been told that plaintiff exposed her breasts while partying on a boat, all while identifying herself as a Normandy police officer. (Doc. 13, SOF at 10; NOR 86.)

Plaintiff was late to work on September 4, 2004. Sergeant Ballard reported that plaintiff arrived at work late, disheveled, and with a faint smell of alcohol on her breath. (Doc. 13, SOF at 10-11; Ex. L.)

Plaintiff participated in a baton training class on September 18, 2004, which involved altercations with fake "attackers." The "attackers" wore foam pads and were told to be aggressive. Plaintiff fell during the exercise and hit her head. Officer Whitworth hit plaintiff with his foot while she was on the ground. Plaintiff had a headache, and took an Aleve, which relieved the pain.[6] (Doc. 13, SOF at 8.)

On October 6, 2004, Connolly recommended to the City Administrator that Gronefeld be terminated because of her tardiness, and because previous progressive discipline did not work. City Administrator George Liyeos made the final decision to terminate plaintiff's employment, effective October 8, 2004. (Doc. 13, SOF at 10-11; Ex. L; Connolly Aff. at 11; Ballard Aff. at 6.)

When a Normandy police officer is late for his shift, someone from the previous shift is required to stay over until that person arrives. (Connolly Aff. at 13; Stuber Aff. at 4-5; Ballard Aff. at 1.)

Chambers never issued any formal or written discipline against plaintiff while she was assigned to his shift. (Doc. 13, SOF at 2.)

---

[6]Plaintiff felt the "attackers," including Officer Stuber and Porzelt, used excessive force and that she was kicked while on the ground. Defendants deny this. Stuber states in his affidavit he did not participate in her drill, and that he only witnessed Whitworth trip over her, not kick her. (Doc. 19 at 3; Stuber's Aff. at 3.)

After her termination, Gronefeld was replaced with another female officer. (Connolly Aff. at 6.)

## IV.  Discussion

### A.  Count I

Count I alleges the City of Normandy violated Title VII by carrying on a hostile work environment, disparate treatment, and retaliation against plaintiff.  Her allegations include the conduct of Chambers, as well as the conduct of other officers in providing back-up, assaulting her during a training exercise, and her being accused of lying when tardy or missing work.  Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

42 U.S.C. § 2000e-2(a)(1).

### 1.  Hostile work environment

Discrimination under Title VII includes inappropriate conduct that creates a hostile work environment.  <u>Nitsche v. CEO of Osage Valley Elec. Co-op.</u>, 446 F.3d 841, 845 (8th Cir. 2006); <u>Cottrill v. MFA, Inc.</u>, 443 F.3d 629, 636 (8th Cir.) <u>cert. denied</u>, 127 S. Ct. 394 (2006).

> To establish a prima facie case of sex discrimination based on a hostile work environment, a plaintiff employee must establish that (1) she was a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment.

<u>Cottrill</u>, 443 F.3d at 636.  Defendants argue that any harassment plaintiff faced was not based on sex, and the conduct was not so severe or pervasive as to affect a term, condition, or privilege of employment. (Doc. 13.)

"The based on sex requirement forces a plaintiff to prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior." <u>Pedroza v.</u>

-8-

Cintas Corp. No. 2, 397 F.3d 1063, 1068 (8th Cir.) cert. denied, 126 S. Ct. 769 (2005). There are three possible ways a plaintiff can prove that a defendant's conduct was based on sex:

1. by showing that the conduct was motivated by sexual desire;

2. by showing that the harasser was motivated by a general hostility towards the opposite gender in the workplace; or

3. by showing comparative evidence that the harasser treated males and females differently in the workplace.

Pedroza, 397 F.3d at 1068; Hocevar v. Purdue Frederick Co., 223 F.3d 721, 737 (8th Cir. 2000) (members of one sex exposed to disadvantageous terms or conditions).

Plaintiff does not argue, and the evidence does not support, that Chambers's conduct, nor anyone else's at Normandy, was based on a sexual desire for her.[7] Most of the incidents she describes involve her being treated poorly by the men. Even the incident where Chambers reached into her shirt to fix her name tag cannot be categorized as sexual conduct stemming from a sexual desire. There is no evidence he touched her inappropriately beyond fixing her name tag, and Gronefeld felt the touching was inappropriate and demeaning, but not a result of his sexual desire for her. She was wearing a bulletproof vest beneath her shirt. (Gronefeld Dep. at 54-60.)

Instead, she alleges that Chambers's conduct, and the conduct of other officers, was motivated by hostility towards women, and that males were treated differently. The proffered evidence is legally insufficient to support a finding that Chambers and the other officers, or the City of Normandy, harbored hostility towards women in general. She points to no language used or conduct that would support that contention. See Hocevar, 223 F.3d at 737 (pervasive use of word "bitch" did not prove general misogynist attitude).

---

[7]In her response to defendants' motion, she argues that she "did not and still does not believe that Sergeant Chambers's actions were sexual in nature." (Doc. 19 at 12.)

In this case, Chambers's alleged derogatory comments toward women, including that they "belonged on the pole" or "in a kitchen" are not enough. "Gender-based insults may create an inference that discrimination was based on sex." Hocevar, 223 F.3d at 737. However, comments such as this have been found to fall short of the facts needed for a hostile work environment claim. See Brinkley v. City of Green Bay, 392 F. Supp. 2d 1052, 1055 (E.D. Wis. 2005) (telling a woman that she belongs in the kitchen is not sufficient for hostile work environment claim; however, evidence of pornographic magazines persistently being kept on-site may be sufficient).

Further, the City of Normandy employed two other female officers, and plaintiff's position was filled with another female officer after she was terminated. Ballard opined that plaintiff would make a good officer if she would try harder, and opined that she did good work when she put forth good effort. (NOR 0067-70.)

Plaintiff also has provided no evidence that she was treated worse than other male officers. Besides her assertions that this was so, there is no evidence of males receiving preferential treatment by Chambers. To the extent any of the other officers treated her differently than they did other officers, i.e., not speaking to her, overwhelming evidence suggests that this was not because of her gender, but because she was often late and forced other officers to cover her shift. There is no evidence that any disparate treatment plaintiff may have experienced was based on her being a female. Further, there is no evidence on the record that the other female officers working for the City of Normandy were treated poorly because of their sex.

Even if plaintiff was subjected to harassment based on her sex, this conduct was not so severe or pervasive as to affect a term, condition or privilege of employment. Harassment is severe and pervasive when it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment." Nitsche, 446 F.3d at 845. This is a high threshold for a plaintiff to overcome, and "'ordinary tribulations in the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' obtain[s] no remedy." Id. at 846-56 (quoting Faragher v. City of Boca

Raton, 524 U.S. 775, 788 (1998)).  "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher, 524 U.S. at 787. Courts must look to the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance.  Id. at 787-88. "[C]onduct must be extreme to amount to a change in the terms and conditions of employment."  Id. at 788.

Considering the above factors, the conduct of Chambers, or anyone at the Normandy Police station, was not so pervasive or severe to constitute a hostile work environment.  Gronefeld alleges that Chambers reached in her shirt to change her name tag during a traffic stop, that he disciplined her in front of others instead of privately, that he seldom let her go out to eat, that he gave her a poor evaluation, and that he threatened her by asking her to take vacation.

While the shirt incident may be considered humiliating, there is no evidence that such conduct was frequent.  The record indicates this was a one-time occurrence.  Even taking plaintiff's account of the baton training exercise as true, that Whitworth kicked her and did not merely trip over her, this, too, was a one-time occurrence.  Even if behavior can be categorized as "boorish and unprofessional," "Title VII is not a general civility code."  Hocevar, 223 F.3d at 738 (four isolated incidents over three-year span, coupled with pervasive foul language, was not enough to find pervasive and severe conduct).  Her poor evaluation by Chambers was only slightly worse than that given to her by Ballard, and it did not result in any discipline.  Being required to eat lunch at the station is not severe conduct, and she was only required to do this three times.  Finally, Chambers's suggestion that she use the remaining time on his shift as vacation cannot be categorized as so severe as to constitute a hostile working environment. Gronefeld categorized her problems with him as personality differences, and there is no indication his ill-will towards her was because she was a woman.

Further, there is no indication here that the City of Normandy did not act reasonably in the way it dealt with the situation between Chambers and plaintiff. Plaintiff's request for a shift change was granted. Given the nature of the two twelve-hour shifts, it was impossible for her never to see Chambers. There is no indication she was forced to have any contact with him beyond the few minutes between shifts. She was never formally disciplined for any run-ins she had with him.

Plaintiff's claim of a hostile work environment against the City of Normandy must fail.

## 2. Disparate Treatment

Title VII also prohibits disparate treatment based on sex. 42 U.S.C. § 2000e-2(a)(1). "[The prima facie case] framework requires a plaintiff to show that (1) she was a member of a protected group; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males." Tenge v. Phillips Modern Ag Co., 446 F.3d 903, 910 (8th Cir. 2006). Once the plaintiff has provided evidence supporting her prima facie case, defendant must come forward with a legitimate, non-discriminatory reason for its actions. Tenge, 446 F.3d at 910. Plaintiff must then show that the reason given is merely a pretext for discrimination. Id.

Defendants argue that plaintiff did not suffer any adverse employment action due to her problems with Chambers, and that she was not treated differently than other similarly situated males. Plaintiff argues that she was disciplined, and ultimately fired, for tardiness, which is adverse action. She further asserts that other male employees were tardy on occasion and never disciplined or terminated.

Plaintiff did suffer adverse employment action in the form of termination, as well as many disciplinary violations leading up to her termination. Thomas v. Corwin, ---F.3d---, 2007 WL 967315, at *11 (8th Cir. Apr. 3, 2007) ("termination . . . unquestionably constitutes an adverse employment action").

However, plaintiff has provided no evidence that she was treated differently than similarly situated males. "To be similarly situated, the comparable employees 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" Tolen, 377 F.3d at 882 (quoting Gilmore v. AT & T, 319 F.3d 1042, 1046 (8th Cir. 2003)); see Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 852 (8th Cir. 2005) (utilizing less onerous standard that plaintiff must show she and other employees were involved in the same or similar conduct, but were disciplined differently).[8]

Here, plaintiff testified that other officers, including males, were often late to work, and did not receive disciplinary action. She does not allege facts that these same officers were subject to the same supervisor. At the time plaintiff was disciplined and ultimately terminated, she was working under Ballard. She does not allege that the other officers were as frequently late as she, or that they often did not call to forewarn others they would be late, as she did. Further, there is documented evidence in plaintiff's personnel file that her reasons for being late were often not credible or were suspicious. Besides stating that tardiness was customary, she points to no specific examples of male employee tardiness, nor does she state that another male employee was tardy as often as she.

To the extent that plaintiff argues she was disciplined differently from men for other reasons, such as report writing, and verbal discipline from Chambers, there is also no evidence that similarly situated men were treated differently. Plaintiff testified she was not allowed to go out for lunch only three times while under Chambers. All other times she was allowed. There is no evidence on the record that

---

[8]The Rodgers court noted that there is a "conflicting line of cases in our Circuit regarding the standard for determining whether employees are similarly situated at the prima facie stage of the McDonnell Douglas burden-shifting framework." Rodgers, 417 F.3d at 851. In Rodgers, the court found that two employees were similarly situated when they both processed transactions for their own bank accounts, and one was terminated and the other received no punishment. Id. at 852.

other officers with her disciplinary history were treated differently when they committed these infractions.

Further, defendants have come forward with a legitimate, non-discriminatory reason for her termination: she was tardy. Plaintiff has provided no evidence that she was not tardy, or that this reason is a pretext.

Plaintiff's disparate treatment claim must fail.

## 3. Retaliation

Plaintiff alleges that the City of Normandy retaliated against her because she filed complaints against Chambers. The actions she alleges were unlawful retaliation were her being disciplined, being denied back-up assistance, being suspended, and ultimately being terminated.

"To establish a prima facie case of retaliation, [Gronefeld] must demonstrate (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action." Thomas, 2007 WL 967315, at *10. Termination is adverse employment action, but plaintiff still must show that she engaged in statutorily protected activity, and that there is a causal connection between her actions and her termination.

Assuming that plaintiff's complaint against Chambers was a statutorily protected activity, plaintiff has not come forth with any evidence that her discipline and subsequent termination, and other disparate treatment, were because of her complaint.

"To prove a causal connection, [plaintiff] must demonstrate the defendants' 'retaliatory motive played a part in the adverse employment action.'" Thomas, 2007 WL 967315, at *10 (quoting Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 896-97 (8th Cir. 2002)). An inference of causal connection can be drawn from the timing of the two events. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119-20 (8th Cir. 2006) (15 days raised inference of causation). Other evidence of causal connection can include comments that reflect animus and inconsistent policy applications. Id.

Nearly a year went by between plaintiff's complaint about Chambers, and her ultimate termination. Eleven months lapsed between her complaint and the baton training incident. Four to six weeks went by after she lodged her formal complaint before plaintiff alleges that any of the other alleged bad treatment, such as getting in trouble for minor infractions, began to occur. Three months went by after her complaint against Chambers before she was disciplined for being tardy. Temporal proximity between the alleged actions must be "very close." <u>Clark County School Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001) (20 months suggests no causality at all). Two months has been held to be insufficient to show a causal connection. <u>Lewis v. St. Cloud State University</u>, 467 F.3d 1133, 1138 (8th Cir. 2006); <u>Kipp</u>, 280 F.3d at 897. Even two weeks has been held "barely" sufficient to show a causal connection. <u>Smith v. Allen Health Systems, Inc.</u>, 302 F.3d 827, 833 (8th Cir. 2002) (two weeks sufficient, but barely so). The timing of events here is not legally sufficient to support a causal connection.

Considering the other factors, there is no evidence that any employee of the City of Normandy made adverse comments to her about her complaint against Chambers. After the Chambers shift change, Ballard gave her a good review, indicating she had the potential to be a good officer. There is substantial evidence that any adverse feelings the other officers had against her were because of her chronic tardiness, not because she filed a complaint against Chambers.

Even if plaintiff sets forth a prima facie case, plaintiff does not show that the reasons cited for her termination were a pretext for retaliatory actions. After plaintiff presents a prima facie case of retaliation, the burden shifts to defendants to show that the reason given is a pretext. <u>Wallace</u>, 442 F.3d at 1120. Here, defendants assert plaintiff was fired for chronic tardiness. Plaintiff has presented no evidence that this is untrue pretext. Plaintiff's retaliation claim against the City of Normandy under Title VII must fail.

Count I of plaintiff's complaint fails as a matter of law.

## B.  Count II

In Count II, plaintiff alleges that the City of Normandy violated the Missouri Human Rights Act by subjecting her to a hostile work environment, disparate treatment, and retaliation.  These claims are based on the same factual allegations as Count I.

Claims under Title VII and the Missouri Human Rights Act are analyzed under the same standard and in the same manner.  <u>Nitsche</u>, 446 F.3d 841, 845 (8th Cir. 2006) ("We analyze Nitsche's claims under both Title VII and the MHRA in the same manner.").  Therefore, for the same reasons plaintiff's Title VII claim in Count I fails, so does Count II.

## C.  Count III

In Count III, plaintiff alleges Chambers, as an individual, violated the Missouri Human Rights Act by subjecting her to a hostile work environment, disparate treatment, and retaliation.

Defendants first argue that the MHRA does not apply to individuals, in that they are not "employers" under the statute.  In <u>Cooper v. Albacore Holdings, Inc.</u>, the Missouri Court of Appeals held that "the plain and unambiguous language within the definition of 'employer' under the MHRA imposes individual liability in the event of discriminatory conduct."  204 S.W.3d 238, 244 (Mo. Ct. App. 2006).  While it is true the Missouri Supreme Court has not directly addressed this issue, it did deny transfer in the <u>Albacore</u> case.  This court will defer to the Missouri state court on this issue of state law and hold that plaintiff is not barred from bringing this claim against defendant Chambers because he is an individual.

Generally, "Missouri courts must evaluate claims arising under the Act according to the methodology established by the U.S. Supreme Court in <u>McDonnell Douglas [Corp.] v. Green</u>, 411 U.S. 792 [, 793] (1973)."  <u>Young v. American Airlines, Inc.</u>, 182 S.W.3d 647, 652 (Mo. Ct. App. 2005).

## 1.  Hostile Work Environment

Under the Missouri Human Rights Act, plaintiff can prove a prima facie case of hostile work environment against Chambers by showing

> (1) she is a member of a protected group; (2) she was
> subjected to unwelcome sexual harassment; (3) the harassment
> was based upon sex; (4) the harassment affected a term,
> condition, or privilege of employment; and (5) the employer
> knew or should have known of the harassment and failed to
> take appropriate remedial action.

Mason v. Wal-Mart Stores, Inc., 91 S.W.3d 738, 742 (Mo. Ct. App. 2002).
These elements are similar to those required for Title VII hostile work
environment claims, and Missouri courts often analyze an MHRA claim like
that of Title VII.  "In deciding a case brought under the MHRA, an
appellate court is guided not only by Missouri law, but also by
applicable federal employment discrimination decisions."  Mason, 91
S.W.3d at 741.

Considering just the actions of Chambers, plaintiff cannot prove
that his conduct was based on sex.  Plaintiff herself admitted there was
a difference in personalities between the two and that she did not feel
the shirt incident was based on sex, but rather that it was humiliating.
Further, for the reasons stated above in Count I, his conduct was not
so pervasive or serious as to affect a term of her employment.

## 2.   Disparate Treatment

To prove a disparate treatment claim under the MHRA, plaintiff
must, as under Title VII, prove that she belongs to a protected class,
that she was capable of performing her job duties, that she suffered
adverse employment action, and that similarly situated employees were
treated differently.  Young, 182 S.W.3d at 654.

For the reasons stated above, there are no questions of fact
regarding this claim, and the evidence is legally insufficient to
support it.

## 3.   Retaliation

"To establish a prima facie case of retaliatory discrimination
[under the MHRA] a plaintiff must prove that: (1) she complained of
discrimination; (2) the employer took adverse action against her; and
(3) a causal relationship existed between the complaint of

discrimination and the adverse employment action." <u>Cooper</u>, 204 S.W.3d at 245.

Against defendant Chambers as an individual, plaintiff cannot show that Chambers took any adverse employment action against her. He never issued any formal, written discipline against her. His evaluation report was not so egregiously different than Ballard's as to raise an inference that he was engaging in adverse treatment. Further, any adverse employment action, including her written discipline and termination, were not enforced by Chambers. Further, much of the retaliatory things she alleges Chambers did occurred before her complaint against him was lodged. This claim fails.

### D. Count IV

Plaintiff alleges in Count IV that defendant Connolly, as an individual,[9] violated the Missouri Human Rights Act by subjecting her to a hostile work environment, disparate treatment, and retaliation. This count is based on factual allegations that Connolly did not intervene when she complained about Chambers, and that he retaliated against her for filing the complaint.

These claims are analyzed under the same MHRA and Title VII law as stated above. For the same reasons, plaintiff's claims must fail.

Under the standards for a hostile work environment, plaintiff alleges no facts and proffers no evidence that Connolly harassed her based on her sex. None of his actions, such as requesting that she work things out with Chambers before her transfer, were assertedly based on sex. No evidence indicated he was sexually attracted to her or that he had a dislike toward all women as he hired three women; and he replaced her with a woman. Further, there is no evidence he treated men and women differently in the workplace.

As to the disparate treatment claim, plaintiff has provided no facts that Connolly treated her differently than similarly situated male employees. Plaintiff bases this allegation on his conduct of not intervening when she complained about Chambers. She has provided no

___

[9]For the same reasons as in Count III, the MHRA applies to individuals.

facts that similarly situated males complained about Chambers and that Connolly intervened and took action. Chambers did take action when plaintiff asked to be moved to a different shift. There is no factual support for this claim.

Concerning the retaliation claim, the evidentiary record is unequivocal that any discipline plaintiff received following her tardiness was because she was, in fact, tardy. For the reasons stated above, there are no facts that lead to a conclusion that Connolly retaliated against plaintiff for filing a complaint against Chambers for removing her name tag.

For the above reasons, the motion of defendants for summary judgment is sustained. An order in accordance with this memorandum is filed herewith.


                                               /S/  David D. Noce
                                               **DAVID D. NOCE**
                                               **UNITED STATES MAGISTRATE JUDGE**

Signed on May 15, 2007.